AO 1~~06~~ (~~Rev. 04/10~~) ~~Application for a Search Warrant~~

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

11/30/23

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Information associated with the cellular
telephone number 317-450-3054, that is stored
at premises controlled by Verizon

)
)
)
)
)
)

Case No.

3:23-mj-512

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
SEE ATTACHMENT A. This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3) (A) and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____New Jersey_____ , there is now concealed *(identify the person or describe the property to be seized):*

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846, and 843(b) | Possession with the Intent to Distribute Controlled Substances and Conspiracy to Commit the Same Use of a Communication Facility to Commit a Felony |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested
  under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

CALVIN BURCH
(Affiliate)

Digitally signed by
CALVIN BURCH (Affiliate)
Date: 2023.11.30
12:45:27 -05'00'

*Applicant's signature*

TFO Calvin Burch, DEA

*Printed name and title*

Sworn to before me and signed ~~in my presence~~ via telephone.

Date: ___November 30, 2023___

City and state: Dayton, Ohio

Caroline H. Gentry
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CEULLUAR TELEPHONE NUMBER 317-450-3054 THAT IS STORED AT PREMISES CONROLLED BY VERIZON | Case No. _____  3:23-mj-512 <br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Calvin Burch, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Verizon, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a Task Force Officer (TFO) with the United States Drug Enforcement Administration (DEA), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 878.  I have been employed as a Task Force Officer with the DEA since March 2022 and a Police Officer with the Springfield Police Division since February 2015.  In 2014, I attended the Clark State Community College which consisted of training in conducting basic

3

police operations. Since then, I have attended many hours of training including, but not limited to, drug trafficking investigations, tactical entry and vehicle arrest operations, criminal interdiction, interview/interrogation, cell phone narcotic investigations, and additional aspects of conducting investigations. Prior to beginning my assignment as a DEA TFO, I was a sworn Law Enforcement Officer of the State of Ohio who was charged with the duty to investigate criminal activity and enforce the criminal laws of the State of Ohio. I have investigated numerous drug trafficking investigations since 2019, when I began the assignment as a narcotics investigator for the Springfield Police Division. I continue to be employed as a Springfield Police Officer.

3.      I also have been involved in narcotic related arrests and executed search warrants that resulted in the seizure of narcotics. During my training, I have learned methods by which drug traffickers possess and distribute controlled substances; the manner and means in which they conceal and launder the proceeds from the distribution of controlled substances; the manner and means in which they protect their proceeds and controlled substances; and the manner in which they attempt to avoid law enforcement detection of their activities.

4.      My experience as a Law Enforcement Officer/Detective with the City of Springfield Police Division in Springfield, Ohio, includes but is not limited to: physical surveillance; supervising informants during the purchases of controlled substances; debriefing persons arrested and convicted of drug trafficking offenses about their illegal activity; compiling, organizing, and analyzing precise location information (GPS data) and telephone toll data; interviewing witnesses; drafting search warrants; seeking seizure of illegal drugs and other evidence of drug violations; searching locations and seizing narcotics, "tools of trade," documents, and the monetary gains of narcotics trafficking; assisting Prosecutors in the prosecution of defendants on trial for state drug violations; and, testifying as a witness

4

concerning the violations of State of Ohio drug laws.

5.     I have participated in the preparation of affidavits in support of numerous search and arrest warrants for violations of State of Ohio criminal laws, as well as in the execution of the same.  In addition, I have on numerous occasions seized contraband, conveyances, currency, drug paraphernalia, and firearms possessed or used in relation to violations of State of Ohio criminal laws.

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846 have been committed, are being committed, and will be committed by Adrian WHITE and others.  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

8.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **PROBABLE CAUSE**

9.      The United States, including the Drug Enforcement Administration, is conducting a criminal investigation into Adrian WHITE, William BATES, and others regarding possible violations of 21 U.S.C. §§ 841(a)(1) (possession with the intent to distribute controlled substances), 843(b) (use of a communication facility to commit a felony), and 846 (conspiracy to possess with the intent to distribute controlled substances).

10.     On August 23, 2023, United States Magistrate Judge Ovington authorized a phone ping for Adrian WHITE'S phone number: 937-270-6552[1].

11.     On August 27, 2023, between the hours of 12:00 – 2:30 pm., WHITE's phone was pinging in the area of the Westwood neighborhood district in Dayton, Ohio. At approximately 12:11 pm., a Dayton Police Officer (DPD) conducted a check at 717 Crestmore Avenue and located a 2014 Chevrolet Impala, bearing the Ohio license plate: JOG8452 and a grey Dodge Charger bearing the Ohio license plate JZW8667.

12.     During the course of investigating this Drug Trafficking Organization (DTO), 717 Crestmore Avenue, Dayton, Ohio has been identified as a frequent location for WHITE and a possible stash house.

13.     On September 4, 2023, at approximately 7:35 am., TFO Sanders, Potter and I conducted surveillance at 38 Whispering Drive, Dayton, Ohio which is believed to be the residence where WHITE resides. Upon my arrival, I observed the 2014 Chevrolet Impala parked in the driveway. Also, WHITE's phone was pinging at this residence.

---

[1] *See* Southern District of Ohio Case No. 3:23-mj-356.

6

14.     At approximately 9:20 am, I observed the 2014 Chevrolet Impala depart from 38 Whispering Drive. Shortly after, TFO Sanders began to follow the 2014 Chevrolet Impala and observed WHITE being the driver and only individual in the 2014 Chevrolet Impala. Investigators ultimately followed this vehicle to 3179 Valerie Arms Drive.

15.     Since December 19, 2022, 3179 Valerie Arms Drive, Dayton, Ohio Unit 14 has been owned by Aye White Investments LLC. Through an open-source search of Aye White Investments LLC, Adrian WHITE is the owner agent of this business. Therefore, I believe that when WHITE goes to 3179 Valerie Arms Drive, he is specifically entering Unit 14.

16.     On September 8, 2023, at approximately 10:31 am, I utilized electronic surveillance and observed the 2014 Chevrolet Impala parked in front of 721 Crestmore Avenue. Approximately three (3) minutes later, I observed WHITE exit 721 Crestmore Avenue, with another unknown male. Both individuals then walked to the south entrance to 717 Crestmore Avenue. Once WHITE got to the side door of 717 Crestmore Avenue, he used a key to unlock the door he and the male went inside. While WHITE was unlocking the door, I observed WHITE wearing a blue latex glove, like ones that have investigators have previously pulled from the trash at 717 Crestmore Avenue as part of this drug investigation.

17.     Based on the above information with WHITE exiting 721 Crestmore Avenue and then utilizing a key to enter 717 Crestmore Avenue, I believe WHITE also has access to both residences. In reviewing the Montgomery County, Ohio Auditor's records, 721 Crestmore Avenue was purchased by AWE WHITE LLC on or around April 4, 2022. According to the Ohio Secretary of State business directory, AWE WHITE LLC's statutory agent is Adrian White. In reviewing the Montgomery County, Ohio Auditor's records, 717 Crestmore Avenue was purchased by                    on or around June 12, 2020. Based on call detail records,

7

WHITE's x6552 number is in communication with 937-610-8342, which per law enforcement databases is registered to                        I believe that since WHITE left 721 Crestmore Avenue with a blue latex glove on, that he may hold drug paraphernalia at this residence and was then going to 717 Crestmore Avenue in order to process drugs.

18.     At approximately 10:55 am., WHITE and the unknown male exited 717 Crestmore Avenue. WHITE walked toward a grey Dodge Charger, similar to the grey Charger, bearing the Ohio license plate JZW8667 and departed the area. Based on the active phone ping of WHITE, he traveled away when the Charger did.

19.     At approximately 3:21 pm., WHITE returned to 721 Crestmore Avenue as a passenger in the grey Dodge Charger, which was confirmed by the active phone ping on WHITE. Approximately one (1) hour later a Dodge Durango arrived in front of 717 Crestmore Avenue and WHITE exited 721 Crestmore Avenue and got into the passenger's seat of the Durango. Seven (7) minutes later, WHITE exited the Durango, went back inside 717 Crestmore Avenue, and the Durango departed.

20.     Based on this observation, with the short meet, in a known drug area, at a known drug house, I believe a drug transaction may have occurred between WHITE and the driver of the Durango.

21.     On September 9, 2023, at approximately 8:00 am, WHITE's phone was pinging in the area of 721 Crestmore Avenue. I then observed via electronic surveillance WHITE exiting 721 Crestmore Avenue empty handed and getting into the 2014 Chevrolet Impala and departing. Approximately 18 minutes later, WHITE returned in the 2014 Chevrolet Impala with a book bag and went into 721 Crestmore Avenue.

22.     At approximately 8:26 am, WHITE exited 721 Crestmore Avenue again without any backpacks and got into the 2014 Chevrolet Impala and departed. Approximately ten (10) minutes later, WHITE returned in the 2014 Chevrolet Impala with a brown bag and went into 721 Crestmore Avenue.

23.     Based on the above information, I believe that WHITE was likely taking 2014 Chevrolet Impala in order to make a run in order to pick up money or drugs to store them in 721 Crestmore Avenue.

24.     On September 11, 2023, at approximately 4:00 am., TFO Sanders, Potter, Allender and I conducted a trash pull at 717 Crestmore Avenue. The trash was placed on the city-owned portion of the alley. A search of the contents within the bags yielded multiple plastic bags with white powdery residue, a blue bowl with white powdery residue, methysulfonymethane powder container with multiple plastic bags inside, two bags with white/ blue powder and multiple shotgun shells.

25.     Based on my training, knowledge and experience, in the drug trafficking world white powdery residue is usually left behind on items after utilizing them to make/cut/or packaging illegal narcotics. I am also aware that methylsulfonymethane is commonly utilized by drug dealers to cut or mix with illegal narcotics in order to double a drug dealer's product. I also know that drugs dealers often are in possession of firearms and ammunition.

26.     The two bags of powder suspected to be narcotics were submitted to the lab for further testing. I have since received reports back from the lab stating that one bag contained, Methamphetamine, Xylazine, and Dimethyl Sulfone. The second bag contained cocaine.

27.     Based on this trash pull, I continue to believe that 717 Crestmore Avenue is a stash house and now also a drug processing house, due to the methylsulfonymethane, a "cutting" agent and packaging items.

28.     On September 21, 2023, at approximately 1:03 pm., I conducted surveillance at 3179 Valerie Arms Drive and Special Agent (SA) Hobbs was conducting surveillance at 717 Crestmore Avenue. During this time, WHITE's phone was pinging in the Valerie Arms Drive area, which is a known location for WHITE. Present at 3179 Valerie Arms Drive was the 2014 Chevrolet Impala and a grey Dodge Charger bearing Ohio license plate JZW8667.

29.     At approximately 1:24 pm., I observed the grey Dodge Charger depart from 3179 Valerie Arms Drive and arrive at 717 Crestmore Avenue at approximately 1:32 pm. WHITE's phone pinged from the Valerie Arms Drive area to the 717 Crestmore Avenue area which leads me to believe WHITE was in the Dodge Charger.

30.     At approximately 1:44 pm., the Dodge Charger pulled into the alleyway south of 717 Crestmore Avenue and met with a Ford F-150. Investigators then followed the Ford F-150, who met up with a white Honda Accord and a black Kia sedan nearby. Once these three vehicles met, SA Roseberry observed the Ford F-150 provide something to the white Honda Accord and these three vehicles then left in tandem.

31.     During this surveillance, investigators followed these three vehicles as they made their way to Indiana. Investigators also observed that two out of three of these vehicles had Indiana license plate. With this information, Dayton DEA investigators were in contact with Indiana DEA who followed these vehicles to Indiana and ultimately conducted a traffic stop on the white Honda Accord. During this traffic stop, law enforcement seized approximately ten (10) pounds of methamphetamine and a firearm. It is my belief that the Dodge Charger, which

WHITE was suspected of being in, provide narcotics to the Ford F-150, which in turn provided the same to the white Honda Accord.

32.     Based on my training and experience, it is common for large scale drug traffickers to travel long distance, like from Indiana to Dayton, Ohio and bring a courier with them in order to insulate themselves from the drugs in case of being stopped by law enforcement.

33.     On October 25, 2023, United States Magistrate Judge Silvain, authorized a phone ping for WHITE's x6552 phone number and a pen register/trap and trace[2].

34.     On Thursday, November 16, 2023, at approximately 9:00 am, DEA Dayton Resident Office Task Force Officers Justin Allender, William Sanders, and I conducted surveillance on Adrian WHITE at 3179 Valerie Arms Drive, Dayton, Ohio.

35.     At approximately 9:58 am, I observed a Chevrolet Impala bearing the Ohio temporary license plate: R267773 arrive at 3179 Valerie Arms Drive and park in the front. After parking, I observed William BATES exit the Impala and proceed to enter the front door of 3179 Valerie Arms Drive. I am able to identify BATES from a distance due to many of hours surveillance on BATES and looking at photos of him.

36.     About ten (10) minutes later, BATES exited the front door of the apartment complex and departed in the Impala. While on surveillance, I learned that the Ohio temporary license plate: R267773 is registered to William BATES.

37.     At approximately 10:15 am, I observed a Kia Forte bearing the Ohio license plate: JSS2994 park in front of the apartment complex. Moments later, Sonqua MCGRAW exited the vehicle; at the same time a blue Dodge Caravan bearing the Ohio temporary license plate:

---

[2] *See* Southern District of Ohio Case No. 3:23-mj-452.

11

R480257 appeared from the rear of the 3179 Valerie Arms Drive and stopped to talk to MCGRAW. While MCGRAW was talking to the driver of the Dodge Caravan, TFO Allender drove by the two and identified WHITE to be the driver and sole occupant within the Dodge Caravan.

38.     Since investigating this Drug Trafficking Organization (DTO), I am already aware that Sonqua MCGRAW is the registered owner of the Kia Forte, JSS2994 and I am also able to identify her from a distance from the hours of surveillance. While on surveillance, I learned that the Ohio temporary license plate: R480257 is registered to Adrian WHITE.

39.     At approximately 10:22 am, I observed MCGRAW getting into her Kia Forte and depart westbound on Valerie Arms Drive; at the same time, WHITE departed eastbound and ultimately traveled to the Northwest Plaza at 2901 Philadelphia Drive. WHITE stopped at a health store and then shortly later returned 3179 Valerie Arms and parked behind the apartment complex.

40.     At approximately 10:43 am, TFO Sanders observed BATES park in front of 3179 Valerie Arms Drive in the Chevrolet Impala that was previously mentioned and walk into the front door of the apartment complex, empty handed.

41.     At approximately 10:51 am, TFO Sanders observed MCGRAW arrive in the previously mentioned Kia Forte, park in the front and then walk into the apartment complex with a clear tote.

42.     At approximately 10:58 am, TFO Sanders observed a black Maserati, bearing the Ohio license plate: KAP4968 park in front of the apartment complex. Shortly after, a heavier set, black female with long dreads exited the driver's seat and moments later got back inside. While the female got back into the driver' seat, WHITE exited the front doors of the 3179 Valerie Arms

12

Drive and got into the passenger's seat of the Maserati. About one (1) minute later, WHITE exited the vehicle and went back into the apartment complex.

43. At approximately 11:05 am, TFO Sanders observed BATES exit 3179 Valerie Arms Drive with a black shoebox and placed it on the passenger's side of the Chevrolet Impala. TFO Sanders then observed BATES get into the driver's seat of the Chevrolet Impala and depart westbound. TFO Allender, Sanders, and I then followed BATES. BATES ultimately made his way to I-70W towards Indiana.

44. Based on the investigation into this DTO, they have connections to Indiana and supply them with multiple pounds of methamphetamine; often times utilizing shoeboxes in order to transport these narcotics. Based on the actions observed at 3179 Valerie Arms Drive and the fact that BATES was now traveling in the direction of Indiana, investigators believed BATES was transporting narcotics.

45. Approximately 11:53 am, TFO Burch was able to contact Ohio Highway Patrol, Trooper Pohlabel in reference to the ongoing investigation. At approximately 11:59 am, Trooper Pohlabel was able to conduct a traffic on the 2014 Chevrolet Impala for following too closely on a commercial tractor trailer combination. The suspect vehicle was approximately 2- 2 ½ vehicle lengths behind the commercial unit at a speed of 70 mph.

46. During the course of this traffic stop, Trooper Pohlabel made contact with the driver who was identified as William BATES. Trooper Pohlabel ultimately utilized his K9, K9 Sahra, in order to conduct a free air sniff around the exterior of the vehicle. K9 Sahra is a certified narcotics detection canine. The canine indicated to the presence of narcotics, which then led to a search of BATES' vehicle.

47.     While searching the vehicle, Trooper Pohlabel located a black shoebox on the rear passenger side floorboard of the vehicle. Within this shoebox, Trooper Pohlabel observed seven (7) ziplock baggies of containing a crystal rocklike substance, suspected of being methamphetamine. Trooper Pohlabel also observed and seized an Apple iPhone, which was located on the center console.

48.     Following the traffic stop with BATES, I reviewed the pen register for WHITES x6552 phone number. While reviewing these records I noticed that during the time DEA Dayton Resident Investigators were conducting surveillance at 3179 Valerie Arms Drive and when BATES was inside and then bought out a shoebox with seven (7) pounds of suspected methamphetamine, WHITE was in contact with the phone number 317-450-3054 (**Target Telephone**). These communications consistented on three text messages and two phone calls, leading up to BATES departing. The area code "317" is associated with Indianapolis, which is the direction that BATES was traveling towards.

49.     It is my belief that the WHITE DTO is a source of supply for individuals in Indiana, based on the prior ten (10) pound methamphetamine seizure from residents of Indiana and the fact that BATES was traveling to Indiana. With this thought, I believe that WHITE was in contact with the **Target Telephone** in order to orchestrate BATES delivering seven (7) pounds of methamphetamine.

50.     I further believe that the **Target Telephone** was being utilized to orchestrate the seven (7) pounds of methamphetamine based on the fact that BATES phone number, x9056 was also in contact with the **Target Telephone** one time, prior to departing for Indiana.

14

51.     The **Target Telephone** is a Verizon telephone number. Indiana DEA and I submitted an administrative subpoena to Verizon for call detail records and subscriber information.

52.     The **Target Telephone** is registered to Humberto LOPEZ at 2665 State Highway 7, North Vernon, Indiana. Indiana DEA believes that **Target Telephone** potentially belongs to the main target for methamphetamine trafficking.

53.     Based on the above information, I believe that the Verizon **Target Telephone** contains information relevant to an ongoing drug trafficking investigation both in the Dayton, Ohio area and Indiana. With this belief I submitted a preservation request to Verizon on November 17, 2023; Verizon later responded that they did in fact preserve the **Target Telephone.**

54.     Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence of a crime - namely, Title 21 U.S.C. §§ 841(a)(1) and 846, Possession with the Intent to Distribute Controlled Substances and Conspiracy to Commit the Same - can be found within the **Target Telephone**.

55.     In my training and experience, I have learned that Verizon is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for Verizon subscribers may be located on the computers of Verizon. Further, I am aware that computers located at Verizon contain information and other stored electronic communications belonging to unrelated third parties.

15

56. Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of Verizon for a period of time.

57. Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon for short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

58. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

16

59.     Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

60.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

61.     Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular

17

device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

62. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

63. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

18

**<u>CONCLUSION</u>**

64.     Based on the forgoing, I request that the Court issue the proposed search warrant.

65.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a <u>district</u> court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

66.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

CALVIN BURCH
(Affiliate)

Digitally signed by CALVIN
BURCH (Affiliate)
Date: 2023.11.30 12:46:11 –05'00'

Calvin Burch
Task Force Officer
Drug Enforcement Administration

By telephone

Subscribed and sworn to before me on _____November 30_____, 2023.

Caroline H. Gentry
United States Magistrate Judge

19

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with 317-450-3054 that is stored at premises owned, maintained, controlled, or operated by Verizon, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.

## <u>ATTACHMENT B</u>

**Particular Things to be Seized**

## <u>I.  Information to be disclosed by Verizon</u>

To the extent that the information described in Attachment A is within the possession, custody, or control of **Verizon,** including any messages, records, files, logs, or information that have been deleted but are still available to **Verizon** or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), **Verizon** is required to disclose the following information to the government for each account or identifier listed in Attachment A:

      a.      All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier;

      b.      All existing printouts from original storage of all of the text messages described above;

      c.      All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from **November 9, 2023** to present;

      d.      All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message;

      e.      All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names,

addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

f.      Detailed billing records, showing all billable calls including outgoing digits, from **November 9, 2023** to present;

g.      All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), from **November 9, 2023** to present;

h.      Incoming and outgoing telephone numbers, from **November 9, 2023** to present;

i.      All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

j.      All records pertaining to communications between **Verizon** and any person regarding the account or identifier, including contacts with support services and records of actions taken.

## II.  Information to be seized by the government

1.      All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with the intent to distribute controlled substances), 843(b) (use of a communication facility to commit a felony), and 846 (conspiracy to possess with the intent to distribute controlled substances) involving **Target**

2

**Telephone** likely possessed by Humberto LOPEZ, since November 9, 2023, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      Voicemail, call logs, pictures, voice memos, and text messages involving the sale and distribution of drugs involving LOPEZ, WHITE, BATES, and other unidentified coconspirators.

b.      Records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts.